501.18173/MGD

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
_____

AMERISURE INSURANCE COMPANY,

      Plaintiff,

v.                                    CIVIL ACTION NO.:

HARDAWAY CONSTRUCTION CORP.,
THE LEGENDS AT SAINT JOHNS
CONDOMINIUM ASSOCIATION,
INC., a Florida not for profit corporation;
VALLEY FORGE INSURANCE COMPANY;
and TRAVELERSINDEMNITY COMPANY,

      Defendants.
_____

## COMPLAINT FOR DECLARATORY JUDGMENT

      COMES NOW the Plaintiff, Amerisure Insurance Company (hereinafter "Amerisure"), by counsel, and seeks a declaration that it has no duty to indemnify or continue to defend Defendant Hardaway Construction Corp. (hereinafter "Hardaway") or any other person or entity claiming to be an insured for the claims Defendant The Legends at Saint Johns ("Legends") filed against Hardaway and others in the Circuit Court of the Seventh Judicial Circuit, in and for St. Johns County, Florida, Case No. 09-CA-2155, by reason of the fact that the claims against Hardaway are specifically excluded from coverage under the subject policy of insurance or are not otherwise covered pursuant to the policy's terms and conditions. For its Complaint for Declaratory Judgment, Amerisure states the following:

# I.

## PARTIES

1.01.  Plaintiff Amerisure is an insurance company incorporated in and existing under the laws of the State of Michigan.  Amerisure maintains its principal place of business in Michigan.

1.02.  Defendant Hardaway is a construction company incorporated in and existing under the laws of the State of Tennessee.  Hardaway maintains its principle place of business in Tennessee.  Hardaway's registered agent for service of process in Florida is Corporate Creations Network, 11380 Prosperity Farms Road, #221E, Palm Beach Gardens, Florida, 33410 US.

1.03.  Defendant Legends is a corporation organized and existing under the laws of the State of Florida.  Legends maintains its principal place of business in Florida. Legends' registered agent for service of process is May Management Services, Inc., 5455 A1A South, St. Augustine, FL 328080 US.

1.04.  Defendant Valley Forge Insurance Company ("Valley Forge") is a subsidiary of Continental Insurance Company.  Valley Forge is a corporation organized and existing under the laws of the State of Illinois and maintains its principal place of business in Illinois.  Valley Forge's registered agent for service of process in Florida is Chief Financial Officer, P.O. Box 6200 (32314-6200), 200 E. Gaines St., Tallahassee, FL 32399-0000 US.

1.05.  Defendant Travelers Indemnity Company ("Travelers") is a corporation organized and existing under the laws of the State of Connecticut and maintains its principal place of business in Connecticut.  Travelers' registered agent for service of

process in Florida is Chief Financial Officer, P.O. Box 6200 (32314-6200), 200 E. Gaines St., Tallahassee, FL 32399-0000 US.

## II.

## JURISDICTION AND VENUE

2.01.   Amerisure brings this action for declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 and Rule 57 of the Federal Rules of Civil Procedure as an actual case or controversy exists between the parties as to the applicability of a policy of insurance.

2.02.   This Court has jurisdiction to hear this cause pursuant to 28 U.S.C. § 1332 as it is between citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and cost.

2.03.   This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391 as a substantial part of the underlying events and omissions giving rise to this claim occurred in this judicial district.

## III.

## BACKGROUND

3.01.   The Legends at Saint Johns in St. Augustine, Florida, was a construction project comprised of fifteen residential condominium units with attached garages; a clubhouse; five buildings with detached garages; a free standing mail kiosk; tennis courts; an entrance sign; an entry gate; grassed areas; two swimming pools with decking and gazebos; paved surfaces such as private drives, parking areas, cart paths, and others; and stormwater drainage ponds and facilities.

3.02.   On or about May 20, 2002, Hardaway and the Legends at SJ, LLC ("Developer"), the developer of the Legends, entered a contract providing that Hardaway would be the general contractor for Phase 1 of the Legends at Saint Johns and releasing Hardaway to begin with buildings 12, 13, and 14 (the "Buildings"), the clubhouse, and certain site work (the "Project").

3.03.   Hardaway completed its work on the Project in various stages.  All three of the Buildings received Temporary Certificates of Occupancy from St. John's County on July 9, 2003 and the architect for the Project provided the certificate of substantial completion for the final Building on October 20, 2003.

3.04.   Upon completion of Hardaway's work on the Project, the Developer withheld a portion of Hardaway's final payment because of alleged defects in the Buildings, including defects in the roof and building envelope/stucco system.

3.05.   The Developer also withheld full payment to a site work contractor, Brown & Luke, alleging that Brown & Luke's work was included in the Developer's contract with Hardaway.

3.06.   Brown & Luke filed suit against the Developer for the unpaid contract balance.

3.07.   On March 15, 2004, the Developer filed a third-party complaint against Hardaway in the Brown & Luke lawsuit.

3.08.   In the third-party complaint, the Developer sought indemnification from Hardaway and asserted claims for breach of contract because of the alleged construction defects and project damages.

3.09.   Count II of the third-party complaint specifically alleged that Hardaway failed to perform required work on the Project in a timely, satisfactory and workmanlike manner and that Hardaway was in default for reasons including but not limited to failure to complete the work, failure to complete the work according to plans and specifications, and for performance of the work in a shoddy and unworkmanlike manner.

3.10.   Attached and incorporated into the third-party complaint the Developer filed against Hardaway was an "Index of Claim" which listed various claims relating to Hardaway's work on the project, including claims involving the stucco and windows.   In pertinent part, the Index of Claim cites the following deficiencies:

a.   Failure to properly dewater site;

b.   Failure to install elevator steel angles;

c.   Unacceptable concrete appearance on all levels of all breezeways, side and front entrances, of all Buildings;

d.   Unacceptable concrete sidewalks;

e.   Unacceptable concrete pre-cast treads;

f.   Failure to install casing bead at all exterior walls to foundation;

g.   Failure to install exterior windows correctly;
Reference – RRDFW Dwg. A27 Window Details, Photographs.  This issue is a potential for major cost as well as liability.  The Owner has retained an engineer and is awaiting the engineer's independent review on the installation, in conjunction with the stucco work (which may, in itself, be deficient).  The windows were not installed per the contract drawings.  Instead, they were installed flush without any means for water to be transferred away from the building face.  There is serious potential for water infiltration.  The Owner has already received complaints from residents about water infiltration.

    h.      Exterior painting contains drips, nail holes not filled, improper substrate preparation, runs and incomplete coverage; and

    i.       Exterior paint on the back of Buildings 13 and 14 is defective.

With regard to both f. and g. above, the Index of Claim referenced the fact that a consultant would be inspecting the property to report on the deficiencies and that it would make that report available in the near future.

3.11.  On April 21, 2004, an engineer conducted a visual inspection of the building envelope of all three Buildings at the request of the Developer.  This report is attached hereto as Exhibit A and describes the following:

    a.      Isolated areas of window leakage;
    b.      Roof flashings and penetrations in fair to poor condition and in need of immediate attention, with nail pops/exposed heads which had caused significant damage to the watertightness of the underlayment and exposed staples indicating improper attachment of shingles;

    c.      No flashing at the horizontal to vertical wall interfaces of the soffit to sloped roof transitions;

    d.      Unsealed voids between the stucco wall and fascia board and at metal  roof transitions;

    e.      Exterior wall cladding and related construction in poor condition, exhibiting numerous deficiencies that would cause premature deterioration of the sheathing, stucco and surrounding construction;

    f.       Missing flashing above heads of windows;

    g.      Missing closure components of the stucco wall at every slab edge;

    h.      Unsealed wall penetrations;

    i.       Voids and unsealed window perimeters;

    j.      Stucco banding deficiencies with regard to vertical wall transitions and wall accessories which leave open voids of in the stucco wall and "cause[d] cracks to occur not only at heads of windows but

other locations of the stucco wall.  These open cracks allow moisture to migrate laterally along the band detrimentally affecting the coating on the wall";

k.      Perimeter window sealant conditions which were inconsistent with regard to the installation of sealant at the stucco band interface;

l.      No flashing installed above the heads of each window;

m.      Lack of horizontal expansion/contraction between floor lines;

n.      Exterior wall framing which did not align with the base slab, leaving a significant gap between the edge of the wall base and the slab edge;

o.      Serious concern with the long term watertight performance of the exterior building envelope of the Buildings; and

p.      Growing concern as to other envelope-related items, including closure of the wall assembly at the base of the slab edge and curtain wall penetrations, as dryer vent louvers and electrical conduits were found to exhibit unsealed perimeter joint conditions that would cause damage to interior wall treatments in the long run.

3.12.   In June 2005, Hardaway and the Developer entered into a settlement agreement under which the Developer agreed to dismiss Count II of the third-party complaint in exchange for Hardaway receiving reduced payment for the Project.

3.13.   In an October 6, 2005 letter to counsel for Hardaway, counsel for Legends stated that there were numerous significant leaks coming either through the exterior insulation finishing system or the roof at the Legends and that this was warranty work that Hardaway's subcontractors should complete

3.14.   In an October 7, 2005 letter to counsel for Legends, counsel for Hardaway responded to counsel for Legends' assertions in the October 6, 2005 letter by stating that the settlement entered by Legends and Hardaway in June 2005 resolved all issues,

including those in the stucco system or installation, and that the only remaining warranty is that regarding the roof.

3.15.   In an October 20, 2005 letter to counsel for Hardaway, counsel for Legends stated that "leaks [we]re prevalent through the stucco facades," that it intended to use Hardaway's subcontractor for the repairs, and that Hardaway was responsible for any payment to the subcontractor.

3.16.   In an October 21, 2005 letter to counsel for Legends, counsel for Hardaway stated that an inspection of the Project showed that the water intrusion at issue was not the result of the roofing system but rather appears to be the result of either points where the porches meet the stucco wall or separation cracks and that the "owner may want to investigate installing soffit type vents in areas such as balcony porches and perform routine inspections for areas that need sealants."

3.17.   Also in the October 21, 2005 letter to counsel for Legends, counsel for Hardaway stated that it did not have "a continuing responsibility for repairs and maintenance to the stucco envelope of the buildings and damages caused by water intrusion" because "clearly the stucco envelope system to the buildings was an issue raised" by Legends with regard to the June 2005 settlement between Hardaway and Legends, among other reasons.

3.18.   In a January 30, 2006 letter to both the president of Hardaway and counsel for Hardaway, counsel for Legends states that an inspection confirmed that "Hardaway did not complete its repairs as both similar and identical defective conditions as those that were initially brought to Hardaway's attention for repair were found on all three buildings in 2006.  In fact, [a January 19, 2006] report records the very same

conditions Hardaway allegedly repaired consistently spread among the three buildings, which conditions have led to additional building water leaks including a partnership unit in building 12."

3.19.   In 2005, Hardaway first purchased liability insurance coverage from Amerisure, which became effective on November 1, 2005.   Hardaway also purchased liability insurance coverage from Amerisure in 2006 and 2007.   The relevant policies include policy number CPP2033162000000 (the "2005 Policy"), policy number CPP 2033162020000 (the "2006 Policy"), and policy number CPP 2033162030007 (the "2007 Policy") (collectively the "Policies").   Certified copies of these Policies are attached as Exhibit B.

**Underlying Lawsuit**

3.20.   On July 1, 2009, Legends filed a complaint (the "Lawsuit") on behalf of owners of units in the Legends ("Homeowners") against the Developer, Hardaway, and a number of other entities.   A copy of the Complaint filed by Legends (the "Underlying Complaint") is attached hereto as Exhibit C.

3.21.   Counts One and Three of the Underlying Complaint apply to Hardaway. (Compl. ¶¶ 97–108; 115–120.)

3.22.   Count One of the Underlying Complaint alleges "Civil Liability for Violation of State Building Codes Act" and alleges that Hardaway is liable for the following deficiencies to the extent that it contributed to any of them:

> a) installation of a one-coat stucco veneer as the exterior building envelope for all the Buildings without the approval of the building official;

> b) installation of the one-coat stucco veneer in a manner that was not in accordance with the evaluation report;

c) installation of the one-coat stucco veneer in a manner that does not comply with the applicable code because it lacks:

i) minimum required thickness,

ii) proper joint spacing,

iii) proper sealing,

iv) proper decorative band placement,

v) embedment of the cement into the lath, and

vii) proper attachment of the lath into the wall sheathing;

d) improper fire blocking of the walls in Phase 1 which violates Chapter 12 of the Florida Fire Prevention Code;

e) improperly sealed and flashed windows which do not prevent moisture intrusion;

f) improper nailing of the sheathing and lath which has compromised the wall sheathing by exposing elements to moisture intrusion;

g) broken, obstruct or improperly attached underground downspout piping;

h) improper sealing of the base plate of the wall which overhangs the floor slab and lacks sufficient separation from the ground in violation of the approved plans;

i) flashing and stucco termination which does not meet minimum requirements or achieve the required performance standard to achieve a proper water intrusion barrier;

j) pavement which does not comply with the plans or the reference to the Florida Department of Transportation standards in the plans because of:

a)  insufficient asphalt thickness;

b)  improper installation at inverted crown;

c)  open joints; and

d)  insufficient subgrade compaction.

k) construction of the drainage swale on the south side of Building 115 in a manner which was not in accordance with the plans for the Facilities and causes it not to drain properly;

l) wall studs on Building 310 that are not plumb;

m) improperly attached soffit which has fallen off in some areas;

n) improperly flashed plumbing stacks at roof penetrations;

o) improperly waterproofed elevator shafts leading to accumulation of water in the pits.

(Compl. ¶ 99.)

3.23.   Count One further alleges that a variety of problems have resulted from the deficiencies set forth above and accordingly seeks damages, interests and costs from each defendant for their respective work relating to each of the alleged defects and violations of the Florida Building Codes Act.  (Compl. ¶¶ 100–105.)

3.24. Count Three of the Underlying Complaint is entitled "Breach of Contractor, Subcontractor & Supplier's Statutory Warranty" and alleges the defendants, including Hardaway, are liable under the statutory warranties of fitness and merchantability contained in § 718.203(2) Fla. Stat. on the basis of the following deficiencies in the Project:

a) installation of a one-coat stucco veneer as the exterior building envelope for all the Buildings without the approval of the building official;

b) installation of the one-coat stucco veneer in a manner that was not in accordance with the evaluation report;

c) installation of the one-coat stucco veneer in a manner that does not comply with the applicable code because it lacks:

i) minimum required thickness,

ii) proper joint spacing,

        iii) proper sealing,

        iv) proper decorative band placement,

        v) embedment of the cement into the lath, and

        vii) proper attachment of the lath into the wall sheathing.

d) improper fire blocking of the walls in Phase 1 which violates Chapter 12 of the Florida Fire Prevention Code;

e) improperly sealed and flashed windows which do not prevent moisture intrusion;

f) improper nailing of the sheathing and lath which has compromised the wall sheathing by exposing elements to moisture intrusion;

g) broken, obstruct or improperly attached underground downspout piping;

h) improper sealing of the base plate of the wall which overhangs the floor slab and lacks sufficient separation from the ground in violation of the approved plans;

i) flashing and stucco termination which does not meet minimum requirements or achieve the required performance standard to achieve a proper water intrusion barrier;

j) pavement that does not comply with the plans or the reference to the Florida Department of Transportation standards in the plans because of:

        e)  insufficient asphalt thickness;

        f)  improper installation at inverted crown;

        g)  open joints; and

        h)  insufficient subgrade compaction.

k) construction of the drainage swale on the south side of Building 115 in a manner which was not in accordance with the plans for the Facilities and causes it not to drain properly;

l) wall studs on Building 310 that are not plumb;

m) improperly attached soffit which has fallen off in some areas;

n) improperly flashed plumbing stacks at roof penetrations;

o) improperly waterproofed elevator shafts leading to accumulation of water in the pits.

p) improperly sloped gutters that cause water to overflow;

q) improper installation of the security switches into the window frames which compromises the water barrier;

r) the sprinkler system was not fully or properly installed and was improperly designed causing incomplete irrigation coverage;

s) discoloration and paint chalking on the exterior walls;

t) landscape lighting that does not function;

u) a volleyball court was not constructed despite being specified in the plans.

(Compl. ¶ 117.)

3.25.   Count Three of the Underlying Complaint further states that as a result of the alleged breach of warranty by the defendants, including Hardaway, Legends has been or with reasonable certainty will be required to spend large sums of money in order to remedy the defects and deficiencies in the Project so that the Project will comply with the plans and specifications, the conditions promised by the Developer, the Florida Building Codes Act, the condition required by the applicable permits, and "good design, engineering, and construction practices of comparable kind and quality," and that Legends will be required to "pay consequential damages to or on behalf of the Homeowners." (Compl. ¶ 118.)

3.26.   Accordingly, Legends seeks damages, interests and costs in Count Three. (Compl. pg. 29.)

3.27.   Upon receiving notice of the claims set forth in the Underlying Complaint, Amerisure retained counsel for Hardaway and is providing a defense for Hardaway alongside Travelers and Valley Forge subject to a reservation of rights letter Amerisure issued at the inception of the claim on September 22, 2009, and updated on March 18, 2009, and March 25, 2010.

## IV.

## COUNT I – DECLARATION THAT CLAIMS ARE NOT COVERED OR ARE OTHERWISE LIMITED

4.01   Amerisure incorporates by reference each and every allegation made in the preceding paragraphs as though set for fully verbatim here and now.

4.02.   All of the Policies provided coverage as follows:

a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply . . .

b.   This insurance applies to "bodily injury" and "property damage" only if:

(1)   The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2)   The "bodily injury" or "property damage" occurs during the policy period; and

(3)   Prior to the policy period no insured listed under Paragraph I. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in who or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the

"bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c.      "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any other "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d.      "Bodily injury" or "property damage" will be will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any 'employee' authorized by [the insured] to give or receive notice of an 'occurrence' or claim:

(1)     Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2)     Receives a written or verbal demand or claim for damages because of the 'bodily injury' or 'property damage; or

(3)     Becomes aware by any other means that 'bodily injury' or 'property damage' has occurred or has begun to occur.

4.03.   All of the Policies also stated under the heading "Exclusions" that:

This insurance does not apply to:

*       *       *

b.      Contractual Liability

"Bodily Injury" or "property damage for which the insured becomes obligated to pay damages by reason of the assumption of liability in a contract or agreement.   This exclusion does not apply to liability for damages:

*       *       *

> (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement . . . .
>
> *     *     *
>
> l.  Damage To Your Work
>
> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

4.04.  The 2005 Policy further included an endorsement entitled "Exclusion – Designated Work" which states as follows:

> This endorsement modifies insurance provided under the following:
>
> > COMMERCIAL GENERAL LIABILITY COVERAGE PART
> > PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> >
> > SCHEDULE
>
> Description of your work:
>
> > 1.  The design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction, or replacement, of and "exterior insulation and finish system" (commonly referred to as a synthetic stucco) or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, doors, windows, roofing, fascia, soffit, gutters, flashings, coatings, caulkings or sealants in connection with such system.
> >
> > 2.  Any work or operations with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system" is used on any part of that structure.

This exclusion applies to "your work" described in Paragraph 1. or Paragraph 2. above performed by you or by others on your behalf.

For the purpose of this endorsement, an "exterior finish and insulation system" means an exterior cladding or finishing system used on any part of any structure, and consisting of:

a.    a rigid or semi-rigid insulation board made of expanded polystyrene or other materials, and

b.    the adhesive and/or mechanical fasteners used to attach the insulation board to the substrate, and

c.    a reinforced base coat, and

d.    a finish coat providing surface texture and color.

This insurance does not apply to "bodily injury" or "property damage" included in the "products – completed operations hazard" and arising out of "your work" shown in the Schedule.

4.05.   The 2006 and 2007 Policies further contained an endorsement entitled

"Exclusion – Exterior Insulation and Finish Systems" which states as follows:

A.    This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

1.   The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, Caulking or sealants in connection with such a system; or

2.   "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

B.    The following definition is added to the Definitions Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

1. A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

2. The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

3. A reinforced or unreinforced base coat;

4. A finish coat providing surface texture to which color may be added; and

5. Any flashing, caulking or sealant used with the system for any purpose.

4.06. All of the Policies also included a "Fungi or Bacteria Exclusion" which stated that:

This insurance does not apply to:

Fungi or Bacteria

a.  "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damages.

b.  Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

* * *

C. The following definition is added to the Definitions Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

4.07.   The Policies defined "Insured contract" in relevant part as:

That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third party or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

4.08.   The Policies defined "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions."

4.09.   The Policies defined "Products-completed operations hazard" by stating that it:

a.   Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1)   Products that are still in your physical possession; or

(2)   Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a)   When all of the work called for in your contract has been completed.

(b)   When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c)   When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b.   Does not include "bodily injury" or "property damage" arising out of:

(1)   The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2)   The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3)   Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

4.10.   The Policies defined "Property damage" as:

a.     Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.     Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

4.11.   The Policies stated that "Your work":

a.   Means:

(1)   Work or operations performed by you or on your behalf; and

(2)   Materials, parts or equipment furnished in connection with such work or operations.

b.   Includes

(1)   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2)   The providing of or failure to provide warnings or instructions.

4.12.   The claims in the Underlying Complaint are based upon, arise out of, or involve property damage which had occurred and was known to Hardaway prior to November 1, 2005, the inception date of Hardaway's coverage from Amerisure, and are thus not covered under the Policies.

4.13.   The claims in the Underlying Complaint are based upon, arise out of, or involve defects and deficiencies in Hardaway's work as defined in the Policies and are excluded from coverage under the Policies.

4.14.   The claims in the Underlying Complaint are based upon, arise out of, or involve defects and deficiencies in Hardaway's "designated work" as defined in the 2005 Policy and are excluded from coverage under the 2005 Policy.

4.15.   The claims in the Underlying Complaint are based upon, arise out of, or involve property damage arising out of, caused by, or attributable to exterior insulation and finish systems as defined in the 2006 and 2007 Policies and are excluded from coverage under the 2006 and 2007 Policies.

4.16.   The claims in the Underlying Complaint are based upon, arise out of, or involve fungi or bacteria as defined in the Policies and are excluded from coverage under the Policies.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Amerisure Insurance Company, prays:

1.     That process issue and be served upon Defendants requiring them to answer this Complaint, and thereafter that this matter be advanced on the calendar for a speedy hearing, pursuant to Rule 57 of the Federal Rules of Civil Procedure;

2.      For a declaration that Amerisure is not obligated to continue to furnish legal counsel or otherwise provide a defense on behalf of Hardaway or any defendants in the Lawsuit now pending in the Circuit Court of the Seventh Judicial District, St. Augustine, Florida;

3.      For a declaration that no coverage is afforded under the Policy for the claims and demands made by or against Defendants herein in the Lawsuit now pending in the Circuit Court of the Seventh Judicial District, in and for St. Johns County, Florida by virtue of one or more of the terms, conditions, or exclusions in the Policy, and that Amerisure be relieved of any duty to defend, indemnify, or pay on behalf of Hardaway any amounts in connection with the Lawsuit;

4.      For a judgment against Travelers and Valley Forge for reimbursement of all fees and expenses incurred by Amerisure in the defense provided against the Lawsuit;

5.      For the costs of this cause; and

6.      For such other and further relief to which plaintiff may be entitled under the facts and circumstances of this cause.

> Respectfully submitted,
> /s/ F. Bradley Hassell
> F. Bradley Hassell, Esquire
> Florida Bar No. 260592
> HASSELL, MOORHEAD & CARROLL
> 149 South Ridgewood Ave., Suite 301
> Post Office Box 2229
> Daytona Beach, FL  32115
> (386) 238-1357
> FBH@Hassell-Legal.com